**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 82552-6-I |
| | ) | |
| J.P., | ) | DIVISION ONE |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |

MANN, J. — J.P. appeals the trial court's decision to uphold the commissioner's order committing J.P. for up to 14 days of more restrictive treatment. J.P. argues that (1) the State presented insufficient evidence to support the trial court's conclusion that J.P. was gravely disabled, (2) the court committed J.P. based on a petition that did not comply with RCW 71.05.230 or due process of law, and (3) the trial court deprived J.P. of their[1] constitutional right to have a jury determine whether they suffered from a mental illness that required involuntary commitment. We affirm.

<u>FACTS</u>

In January 2021, J.P. was 20 years old and lived with their mother. J.P. began not sleeping or eating properly, and developed difficulty communicating. J.P.'s mother

---

[1] The record states that J.P. is a "20-year old non-binary person." For that reason, this opinion identifies J.P. using gender neutral pronouns.

Citations and pin cites are based on the Westlaw online version of the cited material.

was concerned about J.P.'s mental state because they were previously hospitalized for aggression. The mother believed hospitalization helped. After hospitalization, J.P. was able to eat and sleep regularly and was not aggressive. After J.P. deteriorated again, they agreed to seek help and willingly let their mother drive them to the hospital.

On February 25, 2021, a county designated crisis responder (DCR) petitioned for initial detention in King County Superior Court under chapter 71.05 RCW. The DCR noted that he reviewed records from the Swedish Ballard Medical Center Emergency Department and the Seattle Police Department, and that he spoke with J.P.'s mother. The DCR consulted the emergency department physician and considered the physician's opinion that J.P. should be detained.

On March 2, 2021, Navos Behavioral Health Hospital, where J.P. was seeking treatment, petitioned for 14-day involuntary treatment under RCW 71.05.230. The petition alleged that J.P. demonstrated a (1) likelihood of serious harm to others, and (2) met both prongs of grave disability, thus they were gravely disabled and in need of commitment. R. Kapoor,[2] a licensed social worker, and Lauren O'Toole, an advanced registered nurse practitioner, signed the petition.

On March 15, 2021, a hearing to address the petition was held before a King County Superior Court commissioner. The commissioner heard testimony from J.P.'s mother, Erica Williams, the Swedish Records Custodian, and Hyemin Song, the Navos court evaluator. Kapoor and O'Toole did not testify at the hearing. None of the testifying witnesses signed the involuntary treatment petition. J.P. moved to dismiss based on the State's failure to present testimony from the professional staff who signed

---

[2] The record does not contain R. Kapoor's full name.

the petition in violation of RCW 71.05.230(1). The commissioner denied the motion. The commissioner found that J.P. had a behavioral health disorder and as a result presented a likelihood of serious harm and was gravely disabled. RCW 71.05.240(4). The commissioner also found that release on a less restrictive order was not in J.P.'s or the community's best interest.

On March 23, 2021, the superior court denied J.P.'s motion for revision and affirmed the order of commitment.

J.P. appeals.

ANALYSIS

A. Insufficient Evidence

J.P. argues that the State failed to present sufficient evidence to establish that J.P. was gravely disabled under the definition in RCW 71.05.020(23)(a) or (b). We disagree.

The Involuntary Treatment Act (ITA), chapter 71.05 RCW, authorizes Washington courts to commit an individual for up to 14 days if, by a preponderance of the evidence, the petitioning party proves that such person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The court must consider less restrictive alternatives, but if it finds that none are sufficient, the ITA dictates that the court shall order the individual be detained to a licensed treatment facility. RCW 71.05.240(4)(a).

On review, we determine whether substantial evidence supports the trial court's findings and, if so, whether those findings support its conclusions of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898,

982 P.2d 1156 (1999). "Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise." Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980).

RCW 71.05.020(24) defines "gravely disabled" as

a condition in which a person, as a result of a behavioral health disorder:
(a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

When alleging an individual's mental disorder renders them gravely disabled, the State "must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential of his or her health or safety." In re Det. of LaBelle, 107 Wn.2d 196, 208, 78 P.2d 138 (1986). The danger need not be imminent, yet some danger of future serious physical harm must exist. See LaBelle, 107 Wn.2d at 202-04. Here, the court granted the civil commitment petition under both prongs (a) and (b) of the gravely disabled definition. We review each in turn.

There was sufficient evidence to support the trial court's finding that J.P. was in danger of serious physical harm resulting from failure to provide for their essential needs. RCW 71.05.020(24)(a). To establish prong (a), the State must prove both "recent, tangible evidence of failure or inability to provide for . . . essential human needs" and that "the failure to meet these needs placed [the person] 'in danger of

-4-

serious physical harm.'" In re Det. of A.M., 17 Wn. App. 2d 321, 334, 487 P.3d 531 (2021) (quoting LaBelle, 107 Wn.2d at 204-05; former RCW 71.05.020(22)(a) (2018)).

J.P.'s mother stated that she had concern for J.P.'s symptoms such as delusional behavior and disorganization. The mother testified that just before hospitalization, J.P. did not sleep for seven days and could not speak in complete sentences. J.P. would stay up at night and yell at someone to, "get out of my house." J.P.'s mother said that J.P. ate inconsistently and sometimes would not eat and that their paranoia and delusions were increasing. The mother testified to being concerned when J.P. took long walks alone at night, sometimes leaving at 1:00 a.m. and not returning until 8:00 a.m.

On February 24, 2021, J.P.'s mother took J.P. to Swedish's emergency department to receive care. The mother witnessed J.P. running in and out of the street. Hospital security created a barrier on the sidewalk and in the street to protect J.P. The mother was concerned for J.P.'s safety and her ability to assist J.P. in caring for their own health and safety in the community.

Williams, the records custodian at Swedish, testified that, while at Swedish, J.P. was combative and had to be restrained due to a lack of responsiveness to safety precautions. Williams introduced chart notes that described J.P. rubbing butter up and down their arms and hands and persistent nonsensical speech and confusion.

Song, Navos's court evaluator, testified that in forming her expert opinion, she relied on Navos medical chart notes, listened to testimony of witnesses, consulted the treatment team at Navos, and personally observed J.P. Song introduced notes that describe J.P. as continuing to have poor sleep and auditory hallucinations, and they appeared to be distracted by internal stimuli. J.P. continued to have paranoia toward

hospital staff. Song determined that J.P. was gravely disabled as a result of their bipolar disorder and ongoing symptoms.

J.P. argues that their "difficulty" eating was insufficient to meet the standard of danger of physical harm because of an inability to meet essential needs. In A.M., the doctor testified that A.M. refused to eat and could not meet his basic needs of food, health, or safety unless he was hospitalized. A.M., 17 Wn. App. 2d at 333-34. There, the court held that a failure to eat was not enough to prove a failure to meet his essential needs because "[t]here was no evidence of past or recent weight loss or any other health consequence from A.M.'s reluctance to eat or any inability to meet his [activities of daily living]." A.M., 17 Wn. App. 2d at 334. Because there was no established danger from his reluctance to eat, the court found the evidence did not establish that he was gravely disabled. A.M., 17 Wn. App. 2d at 335.

This case is distinguishable. While reluctance to eat is one factor in the court's decision that J.P. is in danger of physical harm, the court relied on many factors to come to that finding. J.P. was violent and their mother had to call 911 for help, J.P. could not form intelligible sentences from a severe lack of sleep, paranoia, and hallucinations, J.P. had trouble drinking and eating, and J.P. would leave for hours in the middle of the night. These factors together with the paranoia and hostility toward the hospital staff allowed the court to determine J.P. possessed a dangerous inability to care for their essential needs.

The collective testimony of J.P.'s mother, Williams, and Song provide sufficient evidence to support the trial court's findings that, by a preponderance of the evidence,

J.P. was at danger of serious physical harm because of an inability to meet essential needs under RCW 71.05.020(24)(a).

Similarly, there is sufficient evidence to support the trial court's finding that J.P. was manifesting severe deterioration in routine functioning and not receiving essential care for their health or safety. RCW 71.05.020(24)(b). To make this finding under prong (b), there needed to be evidence of a severe deterioration in routine functioning. And the evidence must reveal that, without intervention, a person will not receive care that is essential to their health and safety. To justify commitment, such care must be essential to the individual's health and safety, and that harmful consequences are likely to follow if the involuntary care is not ordered. LaBelle, 107 Wn.2d at 208.

J.P.'s mother testified that J.P. experienced a sudden and quick deterioration in their mental state that occurred over a three-month period. Before January 2021, neither J.P.'s mother nor J.P. had experience with mental health professionals. In January 2021, J.P. became violent with their mother and she had to call 911 for help. J.P. was hospitalized for 10 days and the mother testified that J.P. came home presenting much better. At that time, the mother testified that J.P., at baseline, slept regularly, ate food, and spoke clearly. The mother testified that she started to have concerns when J.P.'s behavior changed again in February. J.P. stopped taking their medication. J.P. decompensated and did not sleep for seven days, exhibited paranoia and delusions, could not form sentences, and had an inconsistent diet. The mother testified she could not support J.P.'s needs. Without intervention, there was a substantial risk of continued harm to J.P.'s health. The evidence supports the trial court's findings under RCW 71.05.020(24)(b).

Because substantial evidence supports the trial court's findings under both prongs of RCW 71.05.020(24), the trial court did not err in its legal conclusion that J.P. was gravely disabled.

B. Petition Compliance

J.P. argues that the court improperly committed J.P. because the petition did not comply with RCW 71.05.230 or due process because the professional staff that signed the petition did not testify at the hearing. We disagree.

At the hearing, J.P. raised a half time motion to dismiss based on the violation of RCW 71.05.230(1). The commissioner denied J.P.'s motion. On March 17, 2021, J.P. filed a motion for revision of the court's 14-day detention order arguing that due process and the ITA required the undersigned petitioner to testify at the hearing and that the court should have imposed a less restrictive alternative to detention. On March 23, 2021, the trial court denied the motion and upheld the ruling.

The State's authority to commit people under the ITA is "strictly limited." In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014). Involuntary commitment is a "massive curtailment of liberty," thus, courts must strictly construe the statutes regulating these proceedings. Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); D.W., 181 Wn. 2d at 207. RCW 71.05.230 states:

> (1) The professional staff of the facility providing evaluation services has analyzed the person's condition and find that the condition is caused by a behavioral health disorder and results in: (a) A likelihood of serious harm; (b) the person being gravely disabled; or (c) the person being in need of assisted outpatient behavioral health treatment; and are prepared to testify those conditions are met.
> . . . .
> (4)(a)(i) . . . . The petition must be signed by:

-8-

> (A) One physician, physician assistant, or psychiatric advanced registered nurse practitioner; and
> (B) One physician, physician assistant, psychiatric advanced registered nurse practitioner, or mental health professional.

As this court recently held,

> nothing in the language of the statute suggests a requirement that the professional staff member who signed the petition must testify at the hearing. Such a limitation would create unnecessary delay while doing nothing to further the determination of whether a patient is currently needing treatment. See RCW 71.05.010(c) (legislative intent of ITA is to "provide prompt evaluation and timely appropriate treatment of persons with serious behavioral health disorders").

In re Det. of C.I., 20 Wn. App. 2d 855, 860, 506 P.3d 716 (2022). The statute does not require the persons who signed the petition to testify.

J.P. also argues that due process requirements require dismissal of the petition because the people signing the petition must testify at the hearing.

In Mathews v. Eldridge, 424 U.S. 319, 98 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the court mandated a three-part test to determine whether procedural due process had been violated. The court considers: (1) the private interest to be affected, (2) the risk of erroneous deprivation of that interest and the probable value of additional procedural safeguards, and finally (3) the government's interest, including the function involved and fiscal and administrative factors that the additional procedural requirements would entail. Matthews, 424 U.S. at 334-35.

In applying and balancing the Matthews factors here, J.P.'s argument fails. First, involuntary commitment entails a liberty interest for J.P. However, the second factor regarding erroneous deprivation weighs in the State's favor. The ITA requires that a patient be evaluated by a trained professional staff of the treatment facility, who has

spoken to the patient about a need for treatment, and who has assessed whether an initial detention is warranted. RCW 71.05.230. If commitment is warranted, the patient is assigned an attorney who reviews the evidence, interviews witnesses, can cross-examine any witnesses offered by the State at a subsequent court hearing, can call witnesses and present evidence, and who can present argument against commitment. RCW 71.05.230; 71.05.217. Additional safeguards would not enhance these robust rights. Lastly, the third factor weighs in favor of the State. The public has an interest in involuntarily treating those who have grave disability with a risk of harm to themselves and others.

Here, the State complied with the statutory requirements of RCW 71.05.230 and the Mathews factors do not show additional procedural requirements are necessary to comply with due process. Thus, the court was correct in denying the motion to revise the commissioner's ruling.

C. Right to Jury Trial

J.P. argues that the trial court denied their constitutional right to have a jury determine whether they had a mental illness justifying a 14-day involuntary commitment. We disagree.

This court rejected J.P.'s argument in In re Detention of S.E., 199 Wn. App. 609, 611, 400 P.3d 1217 (2017). We confirmed S.E.'s holding that there is no right to a jury trial in a hearing on a 14-day involuntary commitment petition in In re Detention of T.C., 11 Wn. App. 2d 51, 59-60, 450 P.3d 1230 (2019).

J.P. argues that S.E. erred in its analysis of whether an individual is constitutionally entitled to a jury trial under article I, section 21 of the Washington

Constitution.  See S.E., 199 Wn. App. at 614-15.  Because J.P. advances no novel

theory as to why our analysis in S.E. is incorrect, we decline to overrule its holding.

Affirmed.

_____
Mann, J.

WE CONCUR:

_____          _____
Coburn, J.                                                    Andrus, C.J.