**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of<br><br>M.F.,<br><br>          Appellant. | No. 85142-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — M.F. appeals the trial court's order involuntarily committing him for 14 days of treatment under the Involuntary Treatment Act (ITA), ch. 71.05 RCW. M.F. argues that the State presented insufficient evidence to support the trial court's conclusion that M.F. posed a likelihood of serious harm to others under RCW 71.05.020(37).[1] We affirm.

I

On February 23, 2023, M.F. was found unresponsive at a coffee shop. M.F. was transported to Harborview Medical Center (Harborview), where he was revived by Narcan. A urine test was positive for opioids, methamphetamine, and benzodiazepine. M.F. had a laceration to his forehead and a computerized tomography (CT) scan

---

[1] On May 11, 2023, the legislature amended RCW 71.05.020. LAWS OF 2023, ch. 425, § 20. But the amendments do not affect our analysis, so we will use the current version of the statute.

showed that he had a compression fracture of the cervical spine. M.F. could not say when the injuries occurred or what had caused them.

In the emergency department, M.F. was mumbling incoherently, inappropriately exposed his genitalia, and made a suicidal statement to a nurse. M.F. expressed "hopelessness with his life situation and that he often thinks about ending his life" to a designated crisis responder (DCR). The DCR petitioned for initial detention.

Following M.F.'s initial detention, Harborview petitioned for 14 days of involuntary treatment. Harborview asserted that M.F. was suffering from a mental disorder, M.F. presented a likelihood of serious harm to himself and others, and M.F. was gravely disabled.

Dr. Alvaro La Rosa, a psychiatrist who treated M.F. at Harborview, and Gina Ferrari, a licensed clinical social worker who evaluated M.F., testified at the 14-day involuntary treatment hearing.

Dr. La Rosa testified that because of M.F.'s cervical spine fracture, it was recommended that he wear a neck brace whenever he was out of bed. M.F. had been refusing to wear the brace which could worsen the fracture and could, ultimately, cause paralysis.

Ferrari testified that M.F. had a mental, emotional, or organic impairment, and the working diagnosis for him was schizoaffective disorder. This diagnosis was based on M.F.'s impulsivity, his responding to internal stimuli, his level of agitation, and his mood lability. Ferrari testified that M.F.'s level of disorganization was making it difficult for him to care for his medical needs.

Ferrari reported that during his treatment at Harborview, M.F. was often hostile toward the treatment team. M.F. yelled at them, called them names, "appeared threatening," and was "hostile and agitated" when they approached. M.F. also exposed his genitalia to the treatment team.

M.F. was placed in seclusion because of being a danger to others, unpredictable behavior, and "sexual assault on staff." When treatment staff asked M.F. about the "sexual assault" incident, M.F. admitted that he grabbed a staff member's breast, "I guess I grabbed her breast or something. I can't help it." M.F. also told staff that he was unable to control his urges.

When M.F. was not in seclusion, M.F. would not stay out of other patients' rooms, exposed his genitals, and drank his own urine. Treatment staff noted that M.F. was "sexually focused on female staffs, poor boundary, trying to touch with sexually inappropriate behavior."

M.F. approached a nursing student from behind, grabbed her backside, and walked away and ignored her as if nothing had happened. The nursing student reported that the encounter "was very unsettling and alarming."

Ferrari explained that M.F. had been unable to maintain appropriate boundaries with staff or others on the unit, he remained "impulsive and disorganized, and he has touched staff inappropriately." M.F. had required seclusion "quite a lot due to his inappropriate behaviors on the unit."

The findings on the hearing acknowledged that the court found both Dr. La Rosa and Ferrari's testimony to be credible.

The court found that the State proved by a preponderance of the evidence that as a result of a behavioral health disorder, M.F. was gravely disabled and presented a likelihood of serious harm to others. The court also found that treatment in a less restrictive alternative setting was not in the best interest of M.F. or others. The court ordered that M.F. be committed for 14 days of involuntary treatment.

M.F. appeals.[2]

II

M.F. argues that the State failed to present sufficient evidence to prove that M.F. posed a likelihood of serious harm to others under the definition in RCW 71.05.020(37). We disagree.

The ITA authorizes courts to commit an individual for up to 14 days if, by a preponderance of the evidence, the petitioner proves that such person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The State's authority to commit people under the ITA is "strictly limited." In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014). The court must consider less restrictive alternatives, but if it finds that none are sufficient, the ITA dictates that the court must order the individual be detained to a licensed treatment facility. RCW 71.05.240(4)(a). Involuntary commitment is a "massive curtailment of liberty," thus, courts must strictly construe the statutes regulating these proceedings. Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); D.W., 181 Wn.2d at 207.

---

[2] M.F. does not appeal the trial court's finding that he was gravely disabled.

On review, we determine whether substantial evidence supports the trial court's findings and, if so, whether those findings support its conclusions of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). "Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise." Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980).

RCW 71.05.020(37)(a)(ii) defines "likelihood of serious harm" to others as a substantial risk that physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm.

RCW 71.05.020(37) requires "a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness." In re Det. of T.C., 11 Wn. App. 2d 51, 57, 450 P.3d 1230 (2019) (quoting In re Det. of Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982)).

According to the trial court's written order:

> The court finds by a preponderance of the evidence that [M.F.] is a substantial risk of physical harm to others as evidenced by behavior which has caused such harm, or which places another person or persons in reasonable fear of sustaining such harm as a result of a mental disorder. Gina Ferrari testified that [M.F.] has been sexually focused on the staff at Harborview Medical Center. [M.F.] himself endorsed groping the breasts of a staff member and said he has difficulty controlling himself. Gina Ferrari testified that [M.F.] also groped the rear-end of another staff member. [M.F.] has been frequently in seclusion due to the risk of staff at the hospital.

The trial court's oral ruling was similar:

> [M.F.'s] been observed mumbling to himself, to be pacing on a unit, he's been impulsive, he's been observed talking to himself into the wall, he has been exposing himself on the unit, he has been in lock seclusion due to his behavior and for the safety of others. He grabbed a staff person by the rear end and staff had to intervene. . . . He's focused sexually on the female staff, trying to touch them. He admitted grabbing the breasts of another staff person and has had difficulty controlling his urges, which means he has remained in lock seclusion due to his sexual assaultive behavior. He has difficulty with boundaries. He's been going into other patients' rooms. Again, he's been noted to be exposing himself.[3]

There was sufficient evidence to support the trial court's finding that M.F. posed a likelihood of serious harm to others. RCW 71.05.020(37). Ferrari testified that M.F. had touched at least two staff members at Harborview inappropriately, by groping one's breast and the other's backside. M.F. was "sexually focused on female staff," tried to touch staff, and repeatedly exposed his genitalia to staff and others. M.F. was threatening, hostile, and agitated in interactions with the treatment team requiring his placement in seclusion.

M.F. admitted to grabbing a staff member's breast and explained that he couldn't help it and was unable to control his urges. Further, the treatment provider M.F. grabbed inappropriately reported that the incident with M.F. "was very unsettling and alarming."

M.F. asserts that the facts found by the court show offensive behavior, not behavior causing or threatening serious physical harm. And that there "was no evidence that either of the groped staff members suffered any pain or physical injury." But the statute does not require pain or physical injury, instead it requires a showing of a recent overt act which caused harm or creates a reasonable apprehension of harm.

---

[3] The court incorporated by reference its oral findings of fact and conclusions of law.

T.C., 11 Wn. App. 2d at 57; In re Det. of D.V., 200 Wn. App. 904, 907, 403 P.3d 941 (2017). There was substantial evidence of multiple recent overt acts by M.F. that caused harm to Harborview staff and created a reasonable apprehension of harm to Harborview staff.

Reviewing the record as a whole, the trial court's findings for M.F.'s 14-day involuntary commitment are supported by substantial evidence.

Affirmed.[4]

_Mann, J._

WE CONCUR:

_Smith, C.J._            _Dwyer, J._

---

[4] Involuntary civil commitment cases are not moot on appeal even after the commitment period has ended because such commitments may constitute evidence in later proceedings. See In re Det. of M.K., 168 Wn. App. 621, 629, 279 P.3d 897 (2012); RCW 71.05.245(3). The State does not argue otherwise.